Donald P. FOLEY, Plaintiff,

v.

TRANSOCEAN LTD., Steven L. Newman, and Robert L. Long, Defendants.

No. 10 Civ. 5233 (NRB).

United States District Court, S.D. New York.

Jan. 3, 2011.

Peter George Safirstein, Andrei V. Rado, Anne Marie Vu, Milberg LLP, Hunter Jay Shkolnik, Rheingold, Valet, Rheingold, Shkolnik & McCartney, LLP, New York, NY, for Plaintiff.

Peter Ligh, Sutherland Asbil & Brennan, LLP, New York, NY, John H. Fleming, Patricia A. Gorham, Sutherland Asbill & Brennan LLP, Atlanta, GA, John Willson Spiegel, Mark H. Epstein, Munger, Tolles & Olson

LLP, Los Angeles, CA, Kerry J. Miller, Frilot L.L.C., New Orleans, LA, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

This action is brought against Transocean Ltd. ("Transocean") and its current and most recently former CEOs on behalf of a purported class of investors who purchased or otherwise acquired shares in Transocean between August 5, 2009 and June 1, 2010, the class period. Three investors filed motions seeking to be appointed as lead plaintiff and for their attorneys to be appointed as lead counsel. These include: (1) Johnson Investment Counsel, Inc. ("Johnson"); (2) Danica Pension A/S ("Danica"); and (3) Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands"). For the reasons set forth below, we appoint Danica as lead plaintiff and approve its selection of lead and liaison counsel.

## DISCUSSION

### A. The Private Securities Litigation Reform Act of 1995

The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the appointment of a Lead Plaintiff in "each private action arising under the (Securities Exchange Act) that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(1) & (a)(3)(B)(i). It provides that within 20 days of the filing of the action, plaintiffs are required to publish a notice in a widely circulated business-oriented publication or wire service, informing class members of their right to move the Court, within 60 days of the publication, for appointment as lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(A).

In appointing a lead plaintiff, we are to presume that the "most adequate plaintiff" is the person or group of persons that:

(aa) has either filed the complaint or made a motion in response to a notice (published by a complainant);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted only upon proof by a member of the purported class that the presumptive lead plaintiff:

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

### B. The Presumptive Lead Plaintiff

#### 1. Timely Complaints and Motions

All of the class members seeking appointment as lead plaintiff meet the first requirement in that they have submitted motions for lead plaintiff status in a timely manner.[1] Accordingly, we turn to the second requirement and assess which movant has the largest financial interest in the action.

#### 2. Largest Financial Interest

[1] The PSLRA is not explicit as to the methodology courts are to use in determining which plaintiff has the largest financial interest in the relief sought by the class, and the Second Circuit has not definitively ruled on the proper method. While disputes remain as to the proper methodology, courts in this Circuit have applied a four factor test first set forth in *Lax v. First Merchants Acceptance Corp.*, Nos. 97 Civ. 2715 et al., 1997 WL 461036, at *5 (N.D.Ill. Aug. 11, 1997). These factors include: (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference be-

---

1. Johnson argues that it is "questionable" whether Danica and Virgin Islands made valid motions in this case, since the docket sheets on the Court's Electronic Case Filing ("ECF") system reflect that such motions were made only in the once-related and now dismissed case *Johnson*

*Investment Council v. Transocean Ltd.*, No. 10 Civ. 4515(NRB) (S.D.N.Y. filed June 8, 2010; terminated Sept. 27, 2010). Johnson Reply Brief at 1. However, the motions electronically docketed in the *Johnson* case include this case caption and explicitly make reference to this case.

tween the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBranche & Co.,* 229 F.R.D. 395, 404 (S.D.N.Y.2004) (adopting the four-factor *"Lax* test"); *see also In re Orion Securities Litig.,* No. 08 Civ. 1328(RJS), 2008 WL 2811358, at *5 (S.D.N.Y. July 8, 2008); *In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. 95, 100 (S.D.N.Y.2005) (relying on *Lax* test factors). Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant. *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp.,* 269 F.R.D. 291, 294 (S.D.N.Y.2010); *Reimer v. Ambac Financial Group, Inc.,* Nos. 08 Civ. 411(NRB) et al., 2008 WL 2073931, at *3 (S.D.N.Y. May 9, 2008); *Kaplan v. Gelfond,* 240 F.R.D. 88, 93 (S.D.N.Y.2007); *see Weiss v. Friedman, Billings, Ramsey Group, Inc.,* No. 05 Civ. 4617(RJH), 2006 WL 197036, at *3 (S.D.N.Y. Jan. 25, 2006) ("The amount of financial loss is the most significant of [the *Lax* test] elements") (quoting *In re Vicuron Pharm. Inc. Sec. Litig.,* 225 F.R.D. 508, 510–11 (E.D.Pa.2004)); *see also Takara Trust v. Molex Inc.,* 229 F.R.D. 577, 579 (N.D.Ill. 2005) (in determining the largest financial interest, "most courts simply determine which potential lead plaintiff has suffered the greatest total losses").

The only parties still claiming to have the greatest financial interest are Johnson [2] and

---

[2] It should be noted that wholly apart from financial interest there are two significant issues with Johnson's motion for appointment as lead plaintiff. First, Johnson appears to be an investment adviser lacking constitutional standing under the Second Circuit's decision in *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP,* 549 F.3d 100 (2d Cir.2008). *Huff* held that a litigant must have "legal title to, or a property interest in, the claim" in order to have standing. *Id.* at 108. A mere power of attorney, authorizing the grantee "to act as an agent or an attorney-in-fact for the grantor," is insufficient. *Id.* Based on the record, it appears that Johnson lacks the necessary property interest.

Second, we also have concerns about the suitability of Johnson as lead plaintiff. Our concerns arise from Johnson's various procedural maneuvers. Johnson initially filed its case against Transocean in this District. *Johnson Investment Council v. Transocean Ltd.,* No. 10 Civ. 4515(NRB) (S.D.N.Y. filed June 8, 2010; terminated Sept. 27, 2010). It then moved before the United States Judicial Panel on Multidistrict Litigation ("MDL") to have that case consolidated with a case against Transocean pending in the Eastern District of Louisiana and asked that the consolidated cases be heard in this Court. When the Louisiana action was voluntarily discontinued by its plaintiffs, the MDL dismissed Johnson's motion as moot, and briefing of the instant motion was to resume. Johnson, however, apparently having had a change of heart about the proper venue for this litigation, asked us to stay briefing while it filed a "tag-along" action with the MDL to consolidate the Transocean cases with the BP Securities Litigation. After that request was denied, Johnson decided to voluntarily dismiss the *Johnson* action in this District and re-file it in the Southern District of Texas, thus recreating the litigation's multidistrict character. It then moved to have the MDL consolidate this case, *Foley,* with the *Johnson* case now pending in Texas. The MDL denied the motion, noting Johnson's curious behavior. *In re Transocean Ltd. Sec. Litig.,* 753 F.Supp.2d 1373, 2010 WL 4923895 (J.P.M.L. Nov. 30, 2010). Perhaps having realized that its options with the MDL had been exhausted, Johnson then filed a motion in this action to transfer venue to the Southern District of Texas. We denied the motion on the record at oral argument held on December 17, 2010. *See* Transcript at 5–6.

Given the complexity of Johnson's actions, it is difficult not to conclude that Johnson became concerned that given the case law in this district, it was unlikely it would be appointed lead plaintiff in this Court. *See Huff,* 549 F.3d at 100 (investment advisor lacks constitutional standing); *In re IMAX Sec. Litig.,* Nos. 06 Civ. 6128, 2009 WL 1905033 at *3, 2009 U.S. Dist. LEXIS 58219 at *8 (S.D.N.Y. June 29, 2009) (noting court's hesitance to appoint a lead plaintiff movant with questionable constitutional standing, since movant would face unique legal issues that other class members would not and its appointment "could ultimately severely prejudice the class, either at the class certification stage or on subsequent appeal"); *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp,* 269 F.R.D. 291, 295, (S.D.N.Y.2010) (concluding, along with a majority of courts in this Circuit, that "last in, first out" accounting method is preferable to "first in, first out" for calculating losses suffered by lead plaintiff movants).

The result of Johnson's forum shopping has been a postponement of the appointment of lead plaintiff, and presumably a parallel and unnecessary delay in the resolution of this case. Given

Danica. Virgin Islands concedes in its opposition and reply memoranda that Danica "appears to possess the largest financial interest" and should be the presumptive lead plaintiff.[3] Virgin Islands Memorandum of Law in Response to the Competing Motions at 1.

Johnson argues that it has a greater financial interest than Danica because it purchased a greater number of net shares during the class period, expended a greater amount of net funds, and had greater losses.[4] Danica does not contest that Johnson expended a larger amount of net funds and purchased a greater number of net shares, but does dispute that Johnson has the greatest losses. We turn to this argument now.

### a. *Approximate Losses Suffered*

No party disputes that the "last in, first out" ("LIFO") methodology should be used to measure losses. LIFO calculates losses by assuming that the first stocks to be sold are the stocks purchased most recently prior to that sale. The alternative, "first in, first out" ("FIFO"), assumes that the first stocks to be sold are the stocks that were acquired first. Often, these first-acquired stocks were acquired outside the class period. Since sales matched with pre-class period purchases are not included in the calculation of class period losses, any gains or losses from those most recent sales would not be included in the total loss.

The PSLRA does not address which method of loss calculation should be employed, but courts in this district and others have stated a preference for LIFO over FIFO in assess-

ing loss for purposes of the appointment of lead plaintiff. *City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp,* 269 F.R.D. 291, 295 (S.D.N.Y.2010) (citing *Kuriakose v. Federal Home Loan Mortg. Co.,* No. 08 Civ. 7281(JFK), 2008 WL 4974839, at *3 (S.D.N.Y. Nov. 24, 2008) (citing *Vladimir v. Bioenvision, Inc.,* No. 07 Civ. 6416(SHS)(AJP), 2007 WL 4526532, at *5 (S.D.N.Y. Dec. 21, 2007))). "The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the inflation of the stock price. FIFO ... may exaggerate losses." *In re eSpeed,* 232 F.R.D. at 101; *see also Kaplan,* 240 F.R.D. at 94, n. 7.

Applying LIFO, it is undisputed that Danica's losses are approximately $3.733 million.[5] Johnson initially claimed LIFO losses of $3,385,560. Johnson Memorandum of Law in Support of Motion for Lead Plaintiff at 8. However, in its opposition papers, it changed its method of calculation and claimed LIFO losses of $3,910,122 as compared to Danica's $3,733,374. Johnson explained that the modified numbers were calculated by using the trading data provided by the parties in their Certifications to the Court, but "using a 6/9/10 holding price of $42.58 per share for the loss calculations of each lead plaintiff movant, so all calculations are based upon the same price per share and the Court can compare apples to apples." Johnson Memorandum of Law in Opposition to Competing Motions at 5 n. 4.

---

the fact that it appears Johnson does not have standing, and that it has demonstrated a willingness to sacrifice the interests of the class, it is far from clear that we would appoint Johnson as lead plaintiff even if it did have the greatest financial interest and otherwise met the requirements of Rule 23. Ultimately, however, we find that Danica has a greater financial interest, meets the requirements of Rule 23, and that the presumption in its favor is not rebutted. Thus, we have no need to fully consider the issue of Johnson's standing or whether its procedural digressions have disqualified it.

3. Virgin Islands also acknowledges that there appears to be "no indication that Danica is unable to satisfy the requirements of Rule 23." Virgin Islands Memorandum of Law in Response

to the Competing Motions at 1. It focuses its response and reply briefs on attacking Johnson's standing, and asserting that should we disqualify Danica for any reason, it should be appointed.

4. Johnson does not dispute that Danica purchased more total shares during the class period, the fourth consideration under *Lax.* Johnson Oppo at 4.

5. Danica calculates its LIFO losses at $3,733,089.05. Exh. C to Silk Decl. in Support of Motion to Appoint Danica as Lead Plaintiff. In Johnson's opposition memo, it calculates Danica's losses at $3,733,374. Johnson Memorandum of Law in Opposition to Competing Motions at 5.

When questioned at oral argument as to why we should accept Johnson's second calculation and how that date was selected, Johnson's counsel acknowledged that he could not provide an explanation since that date was selected by the "consultant."[6] Johnson's counsel then asked the Court to assume that Danica's losses were greater, but to find that the difference is small enough that we should focus our attention on the other *Lax* factors. *See* Transcript at 20–22.

In any event, there can be no question that the appropriate numbers to evaluate are the original ones, and Danica has suffered greater approximate losses. We agree with the courts that have concluded that the PSLRA's 90–day "lookback period," which governs the calculation of damages, should apply to estimating losses in determining the presumptive lead plaintiff, at least in the absence of any credible argument that a different calculation method should apply.[7] Johnson provides absolutely no reason why its revised calculation method of applying the stock price on June 9, 2010 is preferable to its own original calculations, and it is not even clear that they are continuing to press this argument. Given Johnson's position and the language of 15 U.S.C. § 78u–4(e), we conclude that the original loss calculations should be applied. Thus, Danica alleges the greatest approximate losses.

### b. *Other Lax Factors*

At oral argument, Johnson argued that even assuming Danica had greater losses, the difference is small enough that it should not be controlling and the Court should consider the other *Lax* factors. *See* Transcript at 20–22. Johnson believes that an evaluation of those numbers demonstrates that it had far more "skin in the game" than Danica. *Id.* at 21.

While it is true that Johnson expended greater net funds and purchased more net shares, these numbers do not outweigh a difference of more than $500,000 in losses. Furthermore, while Johnson's net shares purchased and net funds expended are greater than Danica's, this is only because Danica

---

**6.** Danica points the Court's attention to the fact that the date chosen is the date of the lowest trading price for Transocean stock since April 20, 2010, the date of the explosion on the *Deepwater Horizon.* Transcript at 22. Danica argues that choosing the lowest price was beneficial to Johnson, and assumes that this is why that date was chosen. *Id.*

**7.** 15 U.S.C. § 78u–4(e)(1) states:

"[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."

Several courts have applied this provision to the calculation of losses for determining the presumptive lead plaintiff. *see In re Gen. Elec. Sec. Litig.*, No. 09 Civ.1951(DC), 2009 WL 2259502 at *5, 2009 U.S. Dist. LEXIS 69133 at *13–14 (S.D.N.Y. July 29, 2009) (considering the authority on both sides and determining that the "90–day look-back provision should be applied in calculating [lead plaintiff movant's] purported loss"); *In re Nat'l Australia Bank Sec. Litig.*, No. 03 Civ. 6537(BSJ), 2006 WL 3844465 at *8–9, 2006 U.S. Dist. LEXIS 94162 at *27–28 (S.D.N.Y. Oct. 25, 2006) (determining that a lead plaintiff movant could not have standing because, apply-

ing the 90–day look period to loss calculations, he had not incurred any losses); *In re eSpeed*, 232 F.R.D. at 102 (calculating movant's losses by citing to 78u–4(e) and stating that "shares that were bought during the class period but were not sold during the class period are accounted for as if they had been sold at the average price of the shares in the 90 calendar days following the class period"); *Olsen v. New York Cmty. Bancorp*, 233 F.R.D. 101, 106 (E.D.N.Y.2005) (using 78u–4(e)(1) to calculate losses).

Other courts have held that this provision applies only to the calculation of damages at trial, and is inappropriate for the financial interest determination at this stage in the litigation. *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F.Supp.2d 388, 396 (S.D.N.Y.2008) (rejecting argument that 78u–4(e)(1) should apply to calculations of loss for determining lead plaintiff, noting that the provision "addresses the PSLRA's limitation on damages, not the methodology for determining a proposed lead plaintiff's financial interest in the relief sought"); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 192 F.R.D. 656, 661–62 (D.Colo.2000) ("[T]he determination of financial interest does not equate to damages. Damages is a term of art and a technical matter to be established by experts. The lead plaintiff provision in the PSLRA does not use the term 'damages' but instead, 'largest financial interest.' ... I hold, therefore, that 'damages' under the PSLRA is not the proper test to determine largest financial interest.").

sold many shares during the class period. As discussed in detail below, Danica's low, or even negative, number of net shares purchased and net funds expended does not seem terribly relevant to which movant has the greatest financial interest since all of Danica's sales occurred *after* partial corrective disclosures. In any event, we do not believe Danica's smaller amount of net shares purchased is significant enough to outweigh the fact that it sustained appreciably greater losses.

Upon a consideration of all the *Lax* factors, with a special emphasis on approximate losses, it is clear that Danica has the greatest financial interest in the litigation. Thus, as long as Danica satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, it is the presumptive lead plaintiff.

### 3. *Rule 23*

In order to be the presumptive lead plaintiff, a movant must meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. As this Court has previously noted, "typicality and adequacy of representation are the only provisions [of Rule 23] relevant to the determination of lead plaintiff under the PSLRA." *Shi v. Sina Corp.*, Nos. 05 Civ. 2154(NRB) et al., 2005 WL 1561438, at *2 (S.D.N.Y. July 1, 2005) (quoting *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y.1998)). Further, at this stage of the litigation, only a preliminary showing of typicality and adequacy is required. *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. at 102 (citation omitted).

The typicality threshold is satisfied "where the claims arise from the same conduct from which the other class members' claims and injuries arise." *Id.* Danica and the other members of the class claim to have been injured by purchasing Transocean stock during the class period that was overvalued as a result of defendants' materially false and misleading statements and omissions. Thus, Danica meets the typicality requirement under Rule 23 for purposes of qualification for lead plaintiff.

The adequacy requirement is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy. *See id.*; *Shi*, 2005 WL 1561438, at *2 (citation omitted). Danica has retained Barroway Topaz Kessler Meltzer & Check, LLP as its lead counsel and Bernstein Litowitz Berger & Grossman LLP as its liaison counsel. Both of these firms appear to be competent and experienced counsel. Further, Danica's significant financial interest should ensure vigorous advocacy on behalf of the class. There is also no reason to believe that Danica has interests that are adverse to those of the class members, but this proposition and others will be addressed in more detail in the discussion of rebuttal evidence below.

### C. *The Rebuttal Evidence*

The presumption in favor of Danica may only be rebutted upon "*proof* by a member of the purported class that the presumptive lead plaintiff will not fairly or adequately protect the interests of the class or is subject to unique defenses rendering it incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (emphasis added). Virgin Islands does not dispute that Danica is an adequate lead plaintiff. Johnson, however, articulates a number of reasons why Danica should be disqualified. As discussed above, there are serious doubts as to whether Johnson has constitutional standing to bring a claim in this action, and thus it is far from clear that it is a "member of the purported class." However, in the interest of ensuring that an adequate lead plaintiff is appointed, and since we do not formally reach the issue of Johnson's standing, we will evaluate its arguments against Danica. We find that none of Johnson's concerns are particularly troubling. Not only do they fall far short of "proof" that Danica will be inadequate, but they do not present any cause for concern that Danica will not successfully litigate this case.

### 1. *Danica is a Net Seller*

Johnson first argues that since Danica sold more shares than it purchased during the

class period, it is "ill-suited" to serve as lead plaintiff as it will be subject to unique defenses. It is true that courts have sensibly refused to appoint as lead plaintiff net sellers who are also net *gainers*. *See, e.g. In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173–74 (W.D.N.Y.2007) (collecting cases). Johnson notes, however, that courts are also hesitant to appoint net sellers who are net *losers* because the loss ultimately suffered was "less than it would have been had the [securities] been trading at fair market value." *Id.* at 171–72. Consequently, when a plaintiff sells securities during the class period, it might be benefiting from the fraud by selling at an inflated price. A court could thus be concerned that a lead plaintiff movant who sold shares at an inflated price might find proving damages more of a challenge or could be less motivated to vigorously pursue the litigation.

This approach is inapplicable to these facts, and decisions such as *Bausch & Lomb* are easily distinguishable. In *Bausch & Lomb*, a movant for lead plaintiff bought bonds prior to the class period, and then sold the bonds during the class period but before corrective disclosures. Thus, the movant partially benefited from the fraud, by selling at artificially high prices. Here, however, *all* of Danica's shares were sold after partial corrective disclosures. Exh. A to Silk Decl. in Support of Motion to Appoint Danica as Lead Plaintiff. Therefore, Danica did not benefit from the fraud by selling at inflated prices as in *Bausch & Lomb*.[8] We note in this regard that loss causation "does not require full disclosure, and can be established by partial disclosure during the class period which causes the price of shares to decline." *Montoya v. Mamma.com Inc.*, No. 05 Civ. 2483(HB), 2005 WL 1278097 at *2, 2005 U.S. Dist. LEXIS 10224 at *2 (S.D.N.Y. May 31, 2005). We so no reason why a net seller who sold all of his shares after the fraud began to be exposed, and was thus legally harmed by the fraud in all of its sales,

could not be an adequate lead plaintiff. In fact, such trading behavior is likely typical of most members of the class, many of whom undoubtedly began selling their shares after the explosion on April 20th and the article in the Wall Street Journal on April 29th.

### 2. *Danica's Conflicts of Interest*

Johnson next argues that Danica has disabling conflicts which raise doubts as to whether it can vigorously advocate in this case. Johnson identifies two allegedly problematic relationships. The first is that a wholly owned subsidiary of Transocean has "several licenses" involving oil drilling in the North Sea with a company named P/F Atlantic Petroleum. The Chairman of P/F Atlantic Petroleum is also the Head of External Solutions & Risk Management at Danske Capital, which is a sister subsidiary of Danica Pension.[9] Johnson notes that P/F Atlantic Petroleum's website touts its relationship with international oil companies and discusses how important those relationships are to its business. Exh. 6 to Johnson Memorandum of Law in Opposition to Competing Motions. The second alleged conflict is that Danica's parent company, Danske Bank, is 20% owned by a Danish conglomerate which does business with Transocean. Specifically, Transocean lists the conglomerate as its client on an oil rig located in Qatar. Johnson further notes that the conglomerate's annual report details its significant oil and gas activities in Qatar. Exh. 8 to Johnson Memorandum of Law in Opposition to Competing Motions at 35–37.

Johnson believes the existence of these relationships raise two concerns. First, Johnson suggests there is a "serious question" as to whether Danica would "risk its very profitable business relationship with Transocean—the world's largest offshore drilling contractor." Johnson Memorandum of Law in Opposition to Competing Motions at 13. Second, Johnson posits that it "opens up the risk of back-channel communications

---

**8.** Danica's first sales occurred on April 29, 2010, nine days after the explosion on the *Deepwater Horizon* and the day of a damaging Wall Street Journal report that the oil well lacked an important safety device. On this date, it sold only 1,100 shares, as compared to 7,300 on May 24,

34,500 on May 28, and 75,600 on June 1. Exh. A to Silk Decl.

**9.** The parent company of Danica and Danske Capital is Danske Bank.

between Transocean and Danica, through their affiliates, that Danica's U.S. attorneys would likely not have knowledge." *Id.*

These alleged conflicts are nothing more than speculation. As this Court has noted, the conflict of interest must be shown, not merely speculated, in order to rebut the presumption of the most adequate lead plaintiff. *Reimer v. Ambac Fin. Grp., Inc.,* No. 08 Civ. 411(NRB), 2008 WL 2073931 at *4, 2008 U.S. Dist. LEXIS 38729 at *13 (S.D.N.Y. May 9, 2008). *See also Constance Sczesny Trust v. KPMG LLP,* 223 F.R.D. 319, 324–25 (S.D.N.Y.2004) ("conclusory assertions of inadequacy are ... insufficient to rebut the statutory presumption under the PSLRA without specific support in evidence of the existence of an actual or potential conflict of interest").

In this case, the first alleged conflict does not even appear to exist. As Danica points out, the licenses which created the so-called conflict are stale, having expired in early 2010. Exh. 5 to Johnson Memorandum of Law in Opposition to Competing Motions at 7–8 (Transocean subsidiary "Challenger Minerals North Sea" is listed as a partner in licenses P.099 and P.1478, the former to be relinquished in "early 2010" and the latter "by 31st March 2010"). As for the second alleged conflict, the notion that the relationship between the conglomerate with an ownership stake in Danica and Transocean demonstrates a conflict is belied by Danica's role in this lawsuit, its motion to be named lead plaintiff, and its sworn certification that it will adequately and aggressively lead the class. Exh. A to Silk Decl. in Support of Motion to Appoint Danica as Lead Plaintiff. Furthermore, as Danica also points out, the conglomerate and Transocean have engaged in litigation before. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.,* No. 07–2392 (S.D.Tex. filed July 24, 2007). At bottom, Johnson is asking us to assume that Danica seeks to be lead plaintiff in an attempt to ultimately thwart the class' objectives and ensure that the outcome of the litigation is as least harmful to Transocean as possible. There is absolutely no proof to support this theory, and we decline Johnson's invitation to use our imagination.

### 3. *Danica is a Foreign Entity with no United States Place of Business*

Johnson next argues that Danica is an improper lead plaintiff because it is a foreign entity with no place of business in the United States. Johnson argues that Danica is subject to a unique defense that any judgment rendered in this case could be refused enforcement or *res judicata* effect by a Danish Court. Johnson also argues that Danica's lack of business location or decision maker in the United States calls into question its ability to effectively monitor and participate in the litigation, and will saddle the class with unnecessary and additional costs since it will have to communicate with counsel and otherwise participate in the litigation from abroad. These arguments are unavailing. While in some contexts courts have identified *res judicata* concerns in not appointing foreign investors as lead plaintiffs, this has been explicitly rejected when the foreign lead plaintiff movants are suing as a result of purchases made on a domestic securities exchange. *See, e.g., Sgalambo v. McKenzie,* 268 F.R.D. 170, 176 (S.D.N.Y.2010) (distinguishing cases in which courts have cited *res judicata* concerns when not appointing a foreign investor as lead plaintiff to those involving "foreign cubed plaintiffs," meaning they are foreign investors who purchased shares of a foreign company on a foreign securities exchange). As for the concern that Danica will be unable to monitor the litigation and will incur additional costs, while we do not take this issue lightly, we will not disqualify Danica simply based on Johnson's conjecture as to these issues.

Courts in this District and others have routinely appointed foreign investors as lead plaintiff. *In re Tronox, Inc. Sec. Litig.,* 262 F.R.D. 338, 347 (S.D.N.Y.2009) (collecting cases). Furthermore, while in a recent case the Supreme Court held that Section 10(b) claims brought by foreign cubed plaintiffs could not be brought in the United States, *Morrison v. Nat'l Austl. Bank Ltd.,* — U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), nothing in the Court's decision provides any support for the notion that foreign investors

are not adequate plaintiffs in United States courts when the securities at issue were purchased on a United States exchange. *See Id. at* 2888 ("Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States").

#### 4. *Danica Lacks Standing*

Perhaps in an effort to return the favor, Johnson argues that Danica is also an investment advisor and lacks constitutional standing to bring this action. We disagree. Danica is a pension fund that purchased Transocean stock in its own name. As was made clear via sworn testimony at oral argument, Danica's clients contribute a portion of their salaries to Danica for investment. Danica has exclusive control over the money it receives, invests the money in its own name, and owns all of the assets that it purchases. The beneficiaries of the fund receive returns paid out by Danica, which are based on the profitability of the investments. When Danica's investments lose money, it is Danica that actually suffers the loss. *See* Transcript at 17–18. Its clients suffer as well, but only because Danica has less money to pay out. Thus, we do not believe that Danica lacks constitutional standing under *Huff,* and we are not concerned that this issue could ultimately prejudice the class at certification or on appeal.

#### D. *Appointment of Lead and Liaison Counsel*

The PSLRA directs the lead plaintiff to select and retain counsel to represent the class, subject to the Court's approval. 15 U.S.C. § 78u–4(a)(3)(B)(v). While the "statute evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention[,]" *Kuriakose,* 2008 WL 4974839, at *9 (internal quotation omitted), the Court has discretion to decline to appoint the candidate proposed by lead plaintiff when warranted to protect the interests of the class. *Id.; Pirelli,* 229 F.R.D. at 420, n. 37 (citation omitted); *see also In re Veeco Instruments Inc. Sec. Litig.,* 233 F.R.D. 330, 334 (S.D.N.Y.2005)(approving of lead plaintiff's selection of lead counsel but declining to appoint liaison counsel). Danica has selected Barroway Topaz Kessler Meltzer & Check, LLP as its lead counsel and Bernstein Litowitz Berger & Grossman LLP as its liaison counsel. We find that these law firms have the experience and necessary resources available to litigate this case. We also believe it is reasonable to appoint liaison counsel in these circumstances, given the unique facts before the court and that Barroway Topaz does not have a New York office. Accordingly, we approve the selections.

#### CONCLUSION

For the aforementioned reasons, Danica is appointed lead plaintiff, and its selection of lead and liaison counsel is approved. Danica's counsel is hereby ordered to submit a proposed scheduling order or otherwise be in contact with the Court regarding the next steps in this case within two weeks of the date of this filing.